UNITED STATES of America,

v.

Edward Lloyd WILKINS et al., Defendants.

United States District Court
S. D. New York.

Jan. 18, 1963.

Vincent L. Broderick, U. S. Atty. for Southern Dist. of New York, for United States; Andrew J. Maloney, Asst. U. S. Atty., of counsel.

Irving Younger, New York City, for defendant Edward Lloyd Wilkins.

FREDERICK van PELT BRYAN, District Judge.

Defendants Wilkins and Leary were charged in a two count indictment with (1) forging the endorsement of the payee on a United States Treasury check, and (2) uttering the check on which the endorsement was forged with intent to defraud the United States, both in violation of 18 U.S.C. §§ 495 and 2.

Leary pleaded guilty to both counts of the indictment and is awaiting sentence. Wilkins, having duly waived trial by jury, has been tried before me without a jury.

The four prosecution witnesses were Anna Rivera, the payee of the check; Finelli, who took the check after the codefendant Leary had endorsed the payee's name on it; Smith, who was present when defendant Wilkins and Leary made plans to have the check cashed; and Leary himself.

At the close of the Government's case Wilkins moved for judgment of acquittal pursuant to Rule 29(a), F.R.Cr.P., on the ground that "taking the government's evidence at face value * * * they have not made out a crime under Section 495 of the Criminal Code, the statute involved." The motion was denied subject to renewal at the close of the defendant's case. The defendant then rested and renewed the motion both on the ground originally stated and upon the ground that the Government had failed to prove essential elements of its case beyond reasonable doubt. Decision was reserved on the renewed motion.

I find that the uncontradicted testimony of the witnesses for the prosecution established the following facts:

The Treasury check involved in this case, in the sum of $60, was dated February 28, 1961. It was payable to "A. Rivera unrem wid, 708 Caldwell Ave, Bronx 55 N.Y." The notation "unrem wid" indicated that the payee, Mrs. Rivera, was an unremarried widow and the check was issued in payment of a pension instalment to her.

It is a fair inference that, on the morning of February 28, 1961, the check was stolen from Mrs. Rivera's mailbox at 708 Caldwell Avenue, the Bronx, where she lived. The check never came into her actual possession and she did not endorse it.

Later that morning Wilkins and Smith, a witness at the trial, came to the apartment of Leary's brother-in-law, at 704 Caldwell Avenue, where Leary and his wife and child were living at the time. Wilkins took an envelope out of his pocket with the check in it, showed Leary the check and asked him if he knew where he could get it cashed. After some discussion Leary told Wilkins that he thought he could get it cashed at a place where he used to work by a man named Finelli, if he paid Finelli $25 which he owed him out of the proceeds. Wilkins agreed.

Wilkins then gave Leary the check saying it belonged to his aunt. In fact Wilkins was not in any way related to Mrs. Rivera, the payee. He told Leary that he would give him $5 if he got the check cashed. Leary asked Wilkins to sign the check but Wilkins said "No, you sign it when you get over there", and "If we cash that one, there are some more checks in the mailbox like this."

Leary went to the garage of the New Taxi Dispatch Co. on East 15th Street in Manhattan, and saw Finelli who was employed there. Leary asked Finelli whether Finelli would cash the check for him so that he could pay Finelli the $25 he owed him. Finelli said he had no cash but would try to get it cashed at the office of the Taxi Company. He went into the office and was told that they would cash the check if he signed it.

Leary told Finelli either that the check belonged to his aunt or that it belonged to his friend's aunt and, in substance, that he had her permission to sign it on her behalf and to cash it. Finelli then asked Leary to endorse the check and he did so in Finelli's presence, writing on the back under the printed instructions as to endorsement "A Rivera unrem

wid." Finelli endorsed the check with his own name underneath this signature, took it into the office and cashed it.

Finelli came out of the garage office with the $60 in cash, gave Leary $35 and kept $25, the amount Leary owed him. Leary returned to the apartment at 704 Caldwell Avenue where Wilkins was waiting. He gave Wilkins $30 of the proceeds and kept $5 for himself.

The check was deposited without any further endorsement in the First National City Bank of New York.

On his renewed motion for judgment of acquittal Wilkins maintains that these facts do not make out the crime of forgery under 18 U.S.C. § 495, and that therefore he is entitled to an acquittal on both counts of the indictment.[1] Relying on Gilbert v. United States, 370 U.S. 650, 82 S.Ct. 1399, 8 L.Ed.2d 750 (1962), it is Wilkins' position that forgery, within the meaning and intent of the statute, was not committed when Leary signed the name "A Rivera unrem wid" on the back of the check. This, he urges, is because Finelli knew that Leary was not the payee, saw him sign the payee's name, and took the check in reliance upon Leary's oral representation that he had authority to sign it on the payee's behalf. Therefore, says Wilkins, Leary made what was in effect an agency or "per procuration" endorsement on the check, and if any crime was committed it could not have been forgery under § 495.

▮ Thus, while it is plain that § 495 makes forgery of an endorsement on a Government check a crime (Prussian v. United States, 282 U.S. 675, 51 S.Ct. 223, 75 L.Ed. 610 (1931); United States v. Henderson, 298 F.2d 522 (7 Cir., 1962)), the initial question here is whether under the Gilbert case the endorsement made in the case at bar was a forgery within the meaning of the statute.

In the Gilbert case the petitioner Gilbert was charged with having forged the endorsements of Daniel H. Bartfield and Charline R. Bartfield, the payees, on two Government refund checks. His conviction on these charges was affirmed by the Court of Appeals, 291 F.2d 586 (9 Cir., 1961). The checks were made out to Daniel H. and Charlene R. Bartfield c/o R. Milo Gilbert, 519 Taft Building, Hollywood 28, California. Gilbert had endorsed these checks in his own handwriting

> "Daniel H. Bartfield
> "Charline R. Bartfield
> "R. Milo Gilbert, Trustee"

It was permissible on the facts in the record for the jury to have found that Gilbert had purported to make an agency endorsement in both instances though the record did not show whether its verdict rested on that theory or whether it found that petitioner did not purport to act in a representative capacity when he endorsed the checks. The trial judge refused to instruct the jury that an agency endorsement was not forgery under § 495 and did not explain to it the difference between an agency and a non-agency endorsement. Thus, if an agency endorsement did not constitute forgery under § 495, the petitioner was at least entitled to a new trial under proper jury instructions.

The Supreme Court squarely held that one who endorses a Government check by signing the name of the payee and then his own as agent, when in fact he had no authority, is not guilty of forgery under § 495. This it characterized as a purported but misrepresented agency endorsement.

The original predecessor of § 495 was enacted in 1823, 3 Stat. 771, and has since remained in the respects here pertinent in substantially the same form as § 495. Since nothing to the contrary appeared the court reasoned that Congress then used the word "forge" in the statute in its common law sense and that the

---

1. Defendant cannot be convicted on the second count of uttering unless the writing uttered was forged. 18 U.S.C. § 495.

word as used in § 495, the successor statute, had the same meaning.

After analyzing numerous English and American authorities, including the leading English case of Regina v. White, 2 Car. & K. 404, 175 Eng.Rep. 167 (1847) which passed upon the very point, the court concluded that agency endorsements made without authority did not constitute forgery under the common law as it existed when the 1823 American statute was passed and that therefore the word "forge" in § 495 could not be taken to include such an agency endorsement. It vacated the judgment of conviction and remanded the cause for further proceedings.

In the case at bar the defendant Wilkins maintains that the endorsement of the check by his co-defendant Leary, under the circumstances shown by the record, was a purported but misrepresented agency endorsement within the holding of the Gilbert case and therefore does not constitute forgery under § 495 as the Supreme Court has construed the statute. There are, however, substantial differences between the two cases.

The Gilbert case dealt with a true agency endorsement on the instrument itself—that is to say, the signing by the person charged with forgery of the name of the payee followed by his own name as agent, albeit without authority. In the case at bar Leary signed only the name of the payee and nothing else. He did not sign his own name either as agent or otherwise, and there was no indication on the instrument itself that anyone other than the payee had signed her name to it.

In view of this distinction the holding of the Gilbert case is not controlling here. The Gilbert case does, however, decide that the crime of forgery under 18 U.S.C. § 495 is committed only if the acts charged constituted forgery under the common law as it existed in 1823. Thus, in the case at bar the question that remains is whether the crime of forgery under the common law as it then existed was committed when Leary signed the payee's name to this check under the facts as found.

After extensive research I have found no case in either England or the United States which passes squarely on the point. Regina v. White relied on so heavily by the Supreme Court in Gilbert, like the Gilbert case itself, deals with a "per procuration" or agency endorsement made without authority and its holding is not controlling either. The language of such early commentators as East, Coke, Hawkins and Blackstone,[2] which the Supreme Court in Gilbert thought not to be decisive of the question before it, are also not decisive here.

However, 1 Hawkins, Pleas of the Crown, c. 70, § 2, p. 183 (1762) throws some light on the question. Hawkins says of forgery:

"* * * the Notion of Forgery doth not seem so much to consist in the counterfeiting a Man's Hand and Seal, which may often be done innocently, but in the endeavouring to give an Appearance of Truth to a mere Deceit and Falsity, and * * to impose that upon the World as the solemn Act of another * * *."

And Lord East's comments (2 East, Pleas of the Crown, 852 (1803)), quoted by the court in Gilbert, also have bearing. Lord East said:

"*Forgery* at common law denotes a *false* making (which includes every alteration of or addition to a true instrument), a making *malo animo*, of any written instrument for the purpose of fraud and deceit * * *. [The ancient and modern authorities] all consider the offence as consisting in the false and fraudulent making or altering of such and such instruments." (Emphasis in original.)

2. 2 East, Pleas of the Crown, 850–859 (1803); Coke, Third Institute (1797 ed.) 169; 1 Hawkins, Pleas of the Crown, c. 70 (1762); and, 4 Blackstone's Commentaries (Christian ed. 1809) 247.

10 Halsbury's Laws of England (Viscount Simonds, 3d edition, 1955, p. 836), gives a simple definition of forgery at common law as distinguished from forgery under statute which is drawn from an impressive array of cited authorities.[3] Forgery is there defined as "the fraudulent making of a written instrument which purports to be that which it is not."

The first case cited in Halsbury is In re Windsor, 6 B. & S. 522, 122 Eng.Rep. 1288 (1865). That case was also relied on in In re Extradition of Tully, 20 F. 812 (S.D.N.Y.1884), cited with approval in Gilbert, 370 U.S. p. 657, 82 S.Ct. p. 1403, which early accepted the Regina v. White view of forgery as representing the English common law.

In re Windsor dealt with the attempted extradition to the United States of Windsor, the paying teller of the Mercantile Bank of New York, who was charged with forgery in making false and fraudulent entries on the books of the Bank by which he embezzled upwards of $200,-000. Windsor sought discharge from custody on the ground that the acts charged did not constitute the crime of forgery under the common law of England and the general law of the United States, and that the broader definition of the New York statute which included such acts was not applicable. The judges agreed that they were not bound by the New York statute and applied the common law of England which they deemed to be the same as the general law of the United States.

The case was decided in 1865, subsequent to the passage of the Forgery Act of 1861, supra. It may be noted, however, that it arose under the Extradition Act of 6 and 7 Victoria, c. 76. Victoria ascended the throne on June 20, 1837, and the Extradition Act passed in the sixth and seventh year of her reign

became law in 1843–44. Thus, the statements of the judges in the Windsor case, decided in 1865, like the statements of the judges in Regina v. White decided in 1847, may be taken to be an authoritative expression of the law of forgery under the common law, as it existed in 1823.

The facts in the Windsor case are not helpful here, but the statements of the judges as to the common law of forgery are. Opinions were delivered by Cockburn, C. J., and Blackburn, J., with Shee, J., concurring.

Cockburn, C. J., said:

"We must take the term 'forgery' in the Extradition Act to mean that which by universal acceptation it is understood to mean, namely, the making or altering a writing so as to make the writing or alteration purport to be the act of some other person, which it is not." 6 B. & S. 522, 527.

Blackburn, J. said:

"Forgery is the falsely making or altering a document to the prejudice of another, by making it appear as the document of that person. Telling a lie does not become forgery because it is reduced to writing." 6 B. & S. 522, 529–530.

Moreover, in Regina v. Ritson, 11 Cox's Criminal Cases 352 (1869), also cited by Halsbury in support of its definition of forgery at common law, Kelly, C.B., said:

" * * *, looking at the ancient authorities and the text-books of the highest repute, such as Com.Dig., Bacon's Abr., 3 Co.Inst., and Sir Michael Foster, they are all uniformly to the effect, not that every instrument containing a false statement is a forgery, but that every instrument which is false in a mate-

---

3. As the Supreme Court noted in Gilbert, the Forgery Act of 1861 (24 and 25 Vic., c. 98, § 24) expanded the definition of forgery as understood under the common law to include "unauthorized signings 'per procuration,' with intent to de-

fraud." (Gilbert v. United States, supra, 370 U.S. 656, 82 S.Ct. 1402, pp. 665–6). The present English statute is to the same effect. Forgery Act of 1913, 3 and 4 Geo. V, c. 27, § 1(2).

rial part, and which purports to be that which it is not, or to be executed by a person who is not the real person, or which purports to be dated on a day which is not the real day, whereby a false operation is given to it, is a forgery." (at pp. 356–357)

Both Blackburn, J. and Lush, J., who also sat, expressed the view that forgery was the making of an instrument with a fraudulent intent which purports on the face of it, in some material thing, "to be that which it is not." (at p. 357).

The following colloquy from Regina v. White is even more apposite:

"Pollack, C.B.—If a man said he had authority when he had not, and signed a false name 'per procuration', would that be forgery?

"Wilmore [for the prisoner]—I apprehend that it would, as it would purport to be what it is not." 2 Car. & K. 404, 410.

The rationale of the cases holding that true agency endorsements do not constitute forgery under the common law is that when an agent adds his own signature to that of his principal even though he had no authority to do so, the instrument and the endorsement thereon are no different from what they purported to be. This is not the false *making* of the instrument and thus forgery but merely a false and fraudulent assumption of authority, an act of false pretense. This is the reasoning of Gilbert v. United States, supra, Regina v. White, supra, and Selvidge v. United States, 290 F.2d 894 (10 Cir., 1961), which the Supreme Court in Gilbert cited with approval. The same distinction is made in Marteney v. United States, 216 F.2d 760 (10 Cir., 1954), (construing 18 U.S.C. § 2314), where the court said that the word "forged" was "construed to describe a spurious or fictitious making as distinguished from a false

or fraudulent statement. The words relate to genuineness of execution and not falsity of content." (at p. 763). Other cases cited in Gilbert, 370 U.S. p. 658, 82 S.Ct. 1403 are to the same effect.

In Selvidge v. United States, supra, which was a classic case of an agency endorsement by defendant Selvidge without authority, the court said:

"If Selvidge had merely endorsed the name of her principal and cashed the checks contrary to her instructions, the crime of forgery would have been complete. It is a rule of general application that an agent may commit forgery by making or signing an instrument in disobedience of his instructions or by exceeding his authority." (290 F.2d at p. 895).

The same result follows where an agent having had authority to endorse in the name of his principal, and having done so on many occasions, negotiates an instrument to a person with whom he has previously dealt, this time without authority. In such circumstances the person to whom the instrument is negotiated takes it knowing that the agent rather than the payee signed the payee's name but with the implied representation, not on the instrument itself, that the signer has authority to endorse. This has been held to be forgery. See Yeager v. United States, 59 App.D.C. 11, 32 F.2d 402 (1929)[4] dealing with the forgery section in the District of Columbia Code.

As Blackburn, J., said in In re Windsor, supra, "Telling a lie does not become forgery because it is reduced to writing." The emphasis in common law forgery is on the instrument itself. Implicit in the crime is an attempt to pass off the signature alleged to be forged as the signature of another rather than of the person making it either by direct attempt at imitation or otherwise. See

---

4. The subsequent civil litigation in this matter, Kenney v. North Capitol Savings Bank, 61 App.D.C. 238, 61 F.2d 521 (1932) makes it clear that Yeager actually involved a written agency endorsement. The court in the criminal case, however, rather plainly failed to take notice of this fact.

2 Wharton's Criminal Law and Procedure (Ronald A. Anderson 1957) pp. 400–402.

The emphasis on the instrument itself which is of ancient origin (see Rex v. Jones and Palmer, 1 Leach 366, 168 Eng. Rep. 285 (1785)) is pointed up by what appear to have been the reasons for declaring forgery to be a crime in the first place—the need to protect seal and signature so as to safeguard the holder, and the commercial necessity for making the negotiability of instruments feasible as a practical matter. See discussion in Kessler, Forged Instruments, 47 Yale L.J. 863 (1938).

■ Taking all these considerations into account, it seems plain that the crime of forgery under the common law as it existed in 1823, and therefore under 18 U.S.C. § 495, was committed in the case at bar. Leary, having no authority from Mrs. Rivera, the payee, endorsed the check with her name. He knew that the check was to be cashed by Finelli's employers. It may be fairly inferred he also knew Mrs. Rivera's signature was necessary to give the instrument the appearance of validity or genuineness. An appearance of genuineness was plainly required by Finelli's employers who were actually cashing the check, and, indeed, by the person ultimately to be charged on the instrument, the maker, the Treasurer of the United States.

Leary signed Mrs. Rivera's name as an endorsement to make the instrument purport to be what it was not—a check duly endorsed by the payee, Mrs. Rivera, or, to put it another way, a check with Mrs. Rivera's genuine endorsement upon it. The oral representation made by Leary to Finelli that he had authority to sign on Mrs. Rivera's behalf is wholly irrelevant. It did not in any way alter the basic fact that the signature was placed on the instrument in order to make it appear that it was a valid and genuine instrument capable of negotiation and requiring ultimate payment by the United States, when in fact it was not. I see nothing in the common law which brings this case within the category of "per procuration" or agency endorsements without authority held not to be forgery in such cases as Gilbert, supra, Selvidge, supra, and Regina v. White, supra.

■ Under the common law a person signing a check in the name of another commits forgery unless he believes that he has authority from the other person to do so or bona fide believes that he has such authority. Rex v. Forbes, 7 C. & P. 224, 173 Eng.Rep. 99 (1835); Regina v. Parrish, 8 C. & P. 94, 173 Eng.Rep. 413 (1837); Regina v. Beard, 8 C. & P. 143, 173 Eng.Rep. 434 (1837). Here there was no such authority as both Leary and defendant Wilkins well knew.

There is no doubt that there was the requisite intent to defraud here. Under the facts as established Leary committed forgery within the meaning of the statute and Wilkins was an active participant. Whether or not Wilkins is a principal under § 495, he is plainly chargeable, as an aider and abettor, with being principal under 18 U.S.C. § 2. The Government has proved all the elements of its case against him beyond a reasonable doubt and he is therefore guilty on Count 1.

Upon the facts found Wilkins was also a participant with Leary in knowingly uttering the check with the forged endorsement thereon as charged in the second count, under 18 U.S.C. § 495 and § 2, and is guilty also on Count 2.

The motion for judgment of acquittal is in all respects denied. I find defendant Wilkins guilty on both counts of the indictment.

Judgment of conviction will be entered accordingly.

It is so ordered.